IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

VERENA FISK,

        Plaintiff,

vs.                                                                              No.  04cv0015 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

<u>MEMORANDUM OPINION</u>

This matter is before the Court on Plaintiff's (Fisk's) Motion to Reverse or Remand
Administrative Agency Decision **[Doc. No. 15]**, filed  July 8, 2004 and fully briefed on September
15, 2004.  On July 23, 2003, the Commissioner of Social Security issued a final decision denying
Fisk's claim for disability insurance benefits and supplemental security income benefits.  Having
considered the arguments, pleadings, administrative record, relevant law, and being otherwise
fully informed, the Court finds the motion to remand is not well taken and will be DENIED.

<u>I.  Factual and Procedural Background</u>

Fisk, now forty-three years old (D.O.B. 11/06/62), filed her application for disability
insurance benefits on December 4, 2001 (Tr. 78), alleging disability since November 26, 2001,
due to Hepatitis C, a history of vaginal cancer, and a bipolar disorder.  Tr. 15.  Fisk has a high
school education, two years of college, and past relevant work experience as a bookkeeper.  Tr.
15.  On July 23, 2003, the Administrative Law Judge (ALJ) denied benefits, finding Fisk had
severe impairments but her impairments did "not meet or equal the requirements of any listed
impairment."  Tr. 16.  The ALJ further found Fisk retained the residual functional capacity (RFC)

"to perform the full range of sedentary work."  Tr. 17.  As to her credibility, the ALJ found her

"testimony and complaints of pain and functional restrictions [were] not supported by the

evidence overall in the disabling degree alleged and therefore, lacked credibility."  *Id*.  Fisk filed a

Request for Review of the decision by the Appeals Council.  On December 4, 2003, the Appeals

Council denied Fisk's request for review of the ALJ's decision.  Hence, the decision of the ALJ

became the final decision of the Commissioner for judicial review purposes.  Fisk seeks judicial

review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether he applied correct legal standards.

*Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395

(10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record

or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence,"

*Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291

(10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must

discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative

evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while

the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States*

*Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Fisk makes the following arguments: (1) the ALJ erred in his assessment that her bipolar disorder and fatigue do not prevent her from performing her past relevant work; and (2) the ALJ erred in failing to fully develop the record to support his finding that she could perform the full range of sedentary work.

**A.  Medical Records**

On **September 25, 2000**, Fisk went to Presbyterian Medical Group.  Tr. 154.  Fisk **complained of right upper quadrant abdominal pain for two months**.  Dr. Michael A. Montoya evaluated Fisk.  Tr. 152 -153.  Dr. Montoya performed a physical examination which was essentially normal except for **tenderness in the right upper quadrant with deep palpation and an enlarged liver**.  Dr. Montoya ordered a liver function test, a viral load of hepatitis C, an ultrasound of the liver, a mammogram, and a lipid profile.  Tr. 152.

On **October 25, 2000**, Fisk returned for her follow-up with Dr. Montoya.  Tr. 151.  Dr. Montoya performed a gynecological examination and did a pap smear.  Fisk reported she "**had not had a recurrence of abdominal pain**" since her last visit with Dr. Montoya.  Fisk's **abdominal ultrasound was normal, her liver enzymes were normal, and her viral load indicated a "mild amount of viral loaded at 23,000 copies.**"  *Id.*  Dr. Montoya directed Fisk to decrease her caffeine intake and discontinue drinking alcohol.

On **January 25, 2001**, Fisk returned to see Dr. Montoya.  Tr. 149.  Fisk complained of mild bronchitis.  Dr. Montoya noted Fisk smoked at least one pack per day and was interested in stopping smoking.  Dr. Montoya also noted Fisk's **hepatitis C was at minimal amounts and her liver function tests were normal**.  The physical examination was normal except for some purulent nasal drainage.  Significantly, **the abdomen was soft and nontender**.  Dr. Montoya

4

prescribed an antibiotic for the bronchitis, Wellbutrin 100 mg twice daily for smoking abuse, and a

hepatitis A and hepatitis B series.  Dr. Montoya directed Fisk to return in one month.

On **August 20, 2001**, Fisk went to University Hospital.  Tr. 307.  Fisk had been to the

emergency room for a pulled muscle and was told she appeared jaundiced.  The nurse made an

appointment for Fisk with Dr. Ronica Martinez for October 8, 2001.  Fisk was sent to the

laboratory for a CBC, Chem 7, Cholesterol total, LFTs, and HDL cholesterol.  *See* Tr. 161

(follow-up of ER visit).

On **August 22, 2001**, Dr. Monroe H. Spector, Professor of Internal Medicine at

University Hospital, evaluated Fisk.  Tr. 174-175, 187-188 (letter to Fisk's primary care physician

discussing Dr. Spector's findings and recommendations).  Dr. Susan Anderson, a physician with

University Hospital Family Practice Center, referred Fisk to Dr. Spector due to **complaints of**

**black stools, right upper quadrant abdominal pain, hepatitis C, and possible depression**.

Tr. 175.  Dr. Spector noted Fisk had been to the emergency room for a hamstring injury and was

told she appeared "somewhat icteric."  Tr. 174.  **Dr. Spector noted her CBC, liver profile, and**

**electrolytes were completely normal**.  Dr. Spector also noted Fisk reported a history of

depression but "has not actually been treated for this."  *Id.*  Fisk reported being unable to work

because of her history of hepatitis C.  Dr. Spector  noted he "was not sure what this actually

means at this time as [he] did not explore disability."  *Id.*  **The physical examination was**

**essentially normal**.  Specifically, Dr. Spector found Fisk had **no hepatosplenomegaly (enlarged**

**liver and spleen)**.  Tr. 175.  Dr. Spector assessed Fisk as having "(1) history of hepatitis C, ?

status; (2) history of right upper quadrant abdominal pain, ? etiology; (3) history of black stools, ?

etiology; and (4) possible history of depression in the past."  *Id.*  Dr. Spector recommended Fisk

have her hepatitis A, B, and C status updated, have an ANA in case she decided to have interferon, have a pre-treatment liver biopsy, undergo an upper GI endoscopy, and if she did consider treatment with interferon, undergo a psychiatric evaluation.

On **September 5, 2001**, Fisk had an ultrasound of the abdomen.  Tr. 235.  The results showed a **normal abdominal ultrasound.**

On **November 5, 2001**, Fisk returned for her follow-up with Dr. Spector.  Tr. 178-179, 241, *see also* Tr. 172.  Dr. Greg Nguyenduc evaluated Fisk and discussed the case with Dr. Spector.  Tr. 179.  Dr. Nguyenduc noted Fisk complained of  "**occasional fatigue and weakness** but denied any jaundice, increased abdominal girth, weight loss, or lower extremity swelling."  Tr. 178.  Dr. Nguyenduc also noted, "On review of systems, **she denied any shortness of breath, chest pain, fever, chills, nausea, vomiting, or abdominal pain.**"  *Id.*  The laboratory results from her last visit indicated: a hepatitis C subtype 2B with a PCR[1] of 76,667 viral copies, hepatitis A total antibody positive, hepatitis B surface antibody titer high at 15, and hepatitis B core antibody negative.  *Id.*  The ultrasound of her right upper quadrant showed "**normal appearing liver, no splenomegaly, and no ascites.**"  Tr. 178.  **Total liver enzymes were normal**.  Tr. 179.

Dr. Nguyenduc discussed the treatment of hepatitis C with interferon and ribavirin.  Dr. Nguyenduc noted Fisk was interested in initiating treatment.  Dr. Nguyenduc also noted Fisk had a "history of **mild** depression that had not been evaluated or formally treated by a psychiatrist."  *Id*.  Dr. Nguyenduc assessed Fisk with chronic hepatitis C viral infection subtype 2B and

---

[1] Polymerase chain reaction is a technique used to amplify the number of copies of a specific region of DNA in order to produce enough DNA to be adequately tested.  This technique is used to identify disease-causing viruses such as hepatitis C.  *See What is PCR*, http://hepatitis-c.de/pcr.htm.

recommended treatment with pegylated interferon and ribavirin.  Dr. Nguyenduc counseled Fisk

about the adverse side effects of the treatment, i.e., flu like syndrome, arthralgias, myalgias,

fatigue, weakness, alopecia, leukocytopenia, anemia, and thrombocytopenia.  Dr. Nguyenduc

also informed Fisk that any depression symptoms could be exacerbated by the interferon.  Dr.

Nguyenduc's plan included patient education, baseline lab work, and a psychiatric evaluation "to

evaluate her mild depression symptoms in case she may need treatment during her course of

interferon and ribavirin."  *Id.*

On **November 5, 2001**, Dr. Nguyenduc performed an upper endoscopy.  Tr. 180.  The

endoscopy revealed a small hiatal hernia, and possibly a small erosion at the gastroesophageal

junction.  *Id.*  Dr. Spector prescribed Nexium 40 mg every day.

On **November 19, 2001**, Tom Chandler evaluated Fisk at University Hospital Mental

Health Center.  Tr. 194-199.  Tom Chandler, a licensed professional clinical counselor, completed

a "Behavioral Health Comprehensive Assessment Tool."  *Id.*  Under "chief complaint," he noted:

"Episodic depression since adolescence.  Needs eval. before beginning tx for hep. C."  Tr. 194.

Mr. Chandler also noted Fisk had no past psychiatric treatment history, no past psychiatric

medications, and no past suicide attempts.  *Id.*  Fisk did report having stabbed her former husband

in self-defense and was going to trial on November 29, 2001.  The mental status examination

indicated the following: **well groomed, casual, alert and oriented, appropriate behavior,**

**rapid speech, normal tone, thought process were coherent and fluent, no hallucinations, no**

**suicidal ideation, no delusions, nervous mood (per patient), cognitive functions were intact,**

**and insight and judgment were adequate**.  Tr. 196.  Under "Learning Readiness," the

counselor noted "**recall impaired**."  Tr. 197.  The counselor assessed Fisk with Major Depressive

Disorder, Recurrent.

On **November 26, 2001**, Dr. Arizaga, a psychiatrist, completed a Psychiatric Assessment.

Tr. 192-193.  Dr. Arizaga noted Fisk needed an evaluation prior to beginning treatment for

hepatitis C.  Tr. 192.  Fisk reported she was feeling depressed, had problems sleeping, had

decreased concentration, her energy level was fine, she tended to isolate herself,  and had

increased anxiety secondary to her upcoming trial.  Fisk denied having suicidal ideation,

hallucination, or delusions.  Dr. Arizaga noted **Fisk's cognition, insight, and judgment were**

**intact**.  Dr. Arizaga diagnosed Fisk with bipolar disorder, type II.  Tr. 193.  Dr. Arizaga

prescribed Lithobid (lithium).  Dr. Arizaga also ordered a Chem 7 &, TSH and CBC.

On **November 30, 2001**, Fisk went to the Family Practice Clinic at University Hospital to

establish a primary care provider.  Tr. 181, 305, 159, 203.  On that day, Fisk reported "**no**

**current complaints**."  *Id.*  **Fisk had been on the interferon and ribavirin treatment for one**

**month**.  Fisk informed  Eugene M. Rosenblatt, D.O., that she had recently been diagnosed with

bipolar disorder and was taking Lithium.  **Fisk denied any side effects from any of her**

**medications**.  Dr. Rosenblatt noted:

> ASSESSMENT AND PLAN:
> 1.    Hepatitis C:  Patient will continue with gastroenterology and with current therapy.
> 2.    Gastroesophageal reflux disease:  Stable on Nexium.
> 3.    Tabacco:  The patient recently cut down form 50 to 25 cigarettes a day.  Encouraged
>        tabacco cessation.
> 4.    Bipolar disease:  **Stable on Lithium**.  She reports that he psychiatrist will be
>        monitoring her Lithium levels.
> 5.    History of IV drug abuse:  Stable.  The patient has not done any type of illicit drug
>        use for many years.  Patient would, however, like to have an HIV test today.
> 6.    Healthcare maintenance:  Will schedule a mammogram.  Patient will also obtain
>        medical records from Presbyterian Hospital.  We will also schedule patient for a full
>        physical exam and breast exam and pap smear.

Tr. 181-182.

On **December 3, 2001**, Fisk submitted an Physical Daily Activities Questionnaire.  Tr.

127-132.

On **December 12, 2001**, Dr. Nguyenduc evaluated Fisk.  Tr. 183-184, 240.  Fisk was at

the clinic to start her interferon and ribavirin treatment.  Tr. 183.  Dr. Nguyenduc noted:

> She had laboratory data obtained prior to today's clinic appointment and she is here to review
> her labs.  Presently, she **denied any complaints**.  **No abdominal pain,** abdominal swelling,
> lower extremity swelling, jaundice, icterus, nausea, or vomiting.  The patient incidentally had
> a recent EGD performed 11/01 which showed a small hiatal hernia and esophagitis.  At that
> time, she was started on Nexium and today she reports resolution of her heartburn reflux
> symptoms.

*Id.*  Dr. Nguyenduc noted Fisk had already registered with the hepatitis C program (Tr. 171), had

her interferon and ribavirin medications, and would initiate treatment after attending and

completing a Hepatitis C Patient Education Class that day.  Dr. Nguyenduc also noted Fisk would

be followed by psychiatry for her **mild depression symptoms**.

On **December 13, 2001**, Fisk returned for her follow-up with Dr. Arizaga.  Tr. 191.  On

that day, Fisk reported she was feeling less depressed and was late for a job interview.  The lab

results were normal. Dr. Arizaga noted **Fisk was cooperative, casually dressed, her speech was**

**normal and fluent, her mood/affect were OK and Fisk was euthymic (normal mood, i.e., not**

**depressed)**.  Dr. Arizaga circled "**mildly ill**" under the Clinical Global Impression Scale—

Severity of Illness.   Dr. Arizaga instructed Fisk to continue taking the Lithobid.  Dr. Arizaga also

requested a lithium level, noting she would increase the Lithobid to 900 mg at bedtime if the

lithium level was subtherapeutic.

On **December 19, 2001**, Fisk returned for her follow-up with Dr. Nguyenduc.  Tr. 185-

186.  Fisk complained of a rash at the interferon injection site.  Fisk also had been taking ribavirin

1,200 mg daily.  **Fisk reported she was experiencing arthralgias, myalgias, weakness, and malaise.**  However, Fisk reported tolerating these symptoms "rather well" and was taking Aleve for her muscle aches.  Dr. Nguyenduc instructed Fisk to ice down the injection site approximately five minutes before the injection and five minutes after the injection to minimize any induration or erythema.  Dr. Nguyenduc scheduled Fisk to return in one week for lab work.

On **January 9, 2002**, Fisk returned to University Hospital Mental Health Center.  Tr. 190, 289.  Dr. Pamela Arenella and Dr. Hensler evaluated Fisk.  Dr. Arenella completed a Mental Status exam, finding speech was loud but not pressured, **mood/affect was good**, **euthymic** and **affect irritable, no suicidal ideation, no paranoia, thought process/linear, and insight and judgment were fair**.  Dr. Arenella noted Fisk's lithium level was subtherapeutic and increased the does to 900 mg at bedtime.  Dr. Arenella opined Fisk was "**moderately ill**" on the Clinical Global Impression Scale- Severity of Illness.  Fisk was to return in one month.

On **January 10, 2002**, Fisk submitted a Daily Activities form.  Tr. 115-120.  In response, to the question, "What do you do on a <u>TYPICAL</u> day from the time you wake up until going to bed? Fisk noted: "M-F– Get up, have coffee, get ready for work.  Go to work from 8 am to 5 pm.  Come home– relax, eat dinner, watch movie or read a book– get ready for bed– sleep.  Sat & Sun– get up, have coffee, clean house, do laundry, shower, go shopping – groceries & stuff, have lunch– visit with family & friends– dinner– bed."  Tr. 115.  Fisk reported she took her interferon injections on Friday evenings and "6 hrs after injection my bones hurt, my muscles hurt— if I'm not vomiting , I'm nausea– it hurts to stand up– it hurts to walk– I can no longer go shopping– clean my house or do my laundry.  This effect lasts until Thursday, so I only have Friday mornings & afternoons when I feel good."  *Id.*  Fisk also reported she had no problems getting along with

family, friend, or neighbors.  Tr. 116.  Significantly, Fisk reported she had no problems getting

along with people in authority, responded well to criticism, worked out disagreements when they

occurred, had no difficulty going out in public, had never been in fights or been fired, was able to

plan her day, and had no problem following instructions and carrying them out.  Tr. 117-118.

On **February 15, 2002**, Dr. Julie Farrer, a physician at University Hospital Department of

Medicine– Gastroenterology Clinic, wrote to Ana Maria Y. Rael, M.D, Fisk's physician. Tr. 229-

230.  Dr. Farrer noted Fisk reported **her muscle aches had completely resolved** and **"her**

**nausea, diarrhea, and light headedness had improved** with the decrease does of Pegylated

Interferon."  Tr. 229.  Fisk "**denied any other problems, including fevers, abdominal pain, or**

**jaundice**."  Tr. 229-230.  The physical examination was unremarkable.  Fisk requested Dr. Farrer

increase her interferon dose.  Dr. Farrer agreed to do so since the decreased dose was due to her

symptoms and not related to her blood count.  Fisk was to return to the Liver Clinic in March.

On **February 22, 2002**, Ana Maria Y. Rael, M.D., a physician at University Hospital

Family Practice Clinic evaluated Fisk.  Tr. 202, 226-228, 302.  **Fisk reported she had been**

**fatigued secondary to her hepatitis C treatment**.  Dr. Rael noted Fisk had a prior history of

dysplasia.  Dr. Rael performed an examination and performed a vaginal biopsy.

On **February 27, 2002**, Dr. Hensler and Dr. Arenella evaluated Fisk.  Tr. 288.  Fisk

reported she had started interferon and was **having problems with energy, diarrhea, hair**

**thinning, and some difficulty falling asleep**.  Fisk also reported her mood had been "OK" and

had two tearful episodes in the last two months.  **Fisk stated the lithium was helping her mood**.

Dr. Arenella performed a mental status examination, noting: **casually dressed; speech– normal**

**volume and rate; mood/affect– fine/tired; thought processes linear; no suicidal ideation; no**

11

**hallucinations; no delusions; judgment and insight fair/recognizes need for treatment.** Dr. Arenella noted Fisk's diagnosis of Bipolar Affective Disorder II and opined she was "**stable on lithium.**" Dr. Arenella ordered lab work, directed Fisk to continue taking her lithium and return in one month. Dr. Hensler discussed the case with Dr. Arenella and also opined, "**stable on lithium.**" The physicians noted Fisk was "**mildly ill**" on the Clinical Global Impression Scale–Severity of Illness.

On **March 11, 2002**, Dr. Brian Solan, a physician at University Hospital Family Practice Clinic, noted Fisk's vaginal biopsy report. Tr. 225, 301. Dr. Solan noted the biopsy was consistent with squamous cell carcinoma in situ. Dr. Solan notified Fisk and set up an appointment for her with Dr. Luis Padilla. On the same day, Fisk was treated for pharyngitis with penicillin. Tr. 201.

On **March 14, 2002**, Fisk returned for her follow-up with Dr. Luis Padilla. Tr. 333-337. Dr. Padilla evaluated Fisk and scheduled her for surgery. Tr. 236 (surgery referral form). Dr. Padilla ordered an electrocardiogram which was normal. Tr. 207.

On **March 15, 2002**, Dr. Sanjeev Arora, M.D., Professor of Medicine, Division of Gastroenterology, wrote to Dr. Roniqua Martinez, Fisk's physician. Tr. 222. Dr. Arora informed Dr. Martinez that, in spite of Fisk's recent diagnosis of squamous cell carcinoma of the vagina, she should continue with the hepatitis C treatment. Fisk was to return to the clinic in three months.

On **March 16, 2002,** Dr. LeRoy Gabaldon, a psychologist and nonexamining agency consultant, completed a Psychiatric Review Technique form. Tr. 263-276. Dr. Gabaldon diagnosed Fisk with Bipolar Affective Disorder. Tr. 275. Dr. Gabaldon assessed Fisk under

Listing 12.04 (Affective disorders) and found she had a **mild** degree of limitation in her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace.  Tr. 273.  Dr. Gabaldon also found no episodes of decompensation.  Tr. 273.

On **March 27, 2002,** Dr. Luis Padilla performed a "Wide Local excision, vulvoscopy, colposcopy, and vaginscopy."  Tr. 220, 237.  Fisk's preoperative diagnosis was "squamous cell carcinoma in situ of the vagina."  *Id.*

On **April 4, 2002**, Fisk returned for her postoperative follow-up visit with Dr. Padilla.  Tr. 328-329.  Dr. Padilla described the operative procedure as uneventful and directed Fisk to have follow-up examinations every three months.  Tr. 329.

On **April 8, 2002**, Dr. Padilla removed Fisk's sutures from her vulvar wound.  Tr. 326.  Dr. Padilla reminded Fisk to return in three months for a repeat colposcopy.  Tr. 327.

On **April 8, 2002**, Fisk also returned to University Hospital Mental Health Center.  Tr. 287.  Drs. Arenella and Hensler evaluated Fisk.  Fisk reported her recent surgery.  Dr. Arenella noted Fisk **was not suicidal, was sleeping well, and had no memory or concentration problems**.  Dr. Arenella performed a Mental Status Examination, noting: **casually dressed, well groomed, cooperative, good eye contact; speech– voice hoarse; mood/affect– ok/blunted; thought processes linear; judgment and insight– fair; no suicidal ideation, no delusions, no hallucinations.**  Dr. Arenella noted Fisk was more depressed due to recent secondary stressors (surgery for cancer).  Dr. Arenella directed Fisk to continue taking the Lithobid 900 mg at bedtime.  Dr. Arenella noted Fisk was "**moderately ill**" on the Clinical Global Impression Scale–Severity of Illness.

13

On **April 12, 2002**, Dr. Julie Farrer wrote to Veronica Martinez, M.D., Fisk's physician. Tr. 217-218, 239, 260.  Dr. Farrer had seen Fisk at the Hepatitis C Clinic.  Dr. Farrer noted Fisk reported having side effects from the Pegylated Interferon.  **Fisk complained of fatigue, muscle aches, joint pain, dizziness, and intermittent diarrhea**.  However, Fisk **reported doing well and the side effects were improving**.  Dr. Farrer noted Fisk had been treated in March for squamous cell carcinoma of the vagina by Dr. Luis Padilla (Tr. 220).  Dr. Farrer also noted, "**she has a history of bipolar disorder, she is taking Lithium, and she is currently stable**."  Tr. 218.  The physical examination was unremarkable.  Specifically, the exam showed no hepatosplenomegaly.  Fisk was to return to the Hepatitis C Clinic in two months.

On **May 3, 2002**, Fisk returned for a follow-up with Dr. Solan. Tr. 254-255, 298-299. Dr. Solan noted Fisk would be followed up by Dr. Padilla for her vaginal cancer.  Dr. Solan ordered lab work to check her lipids.

On **May 16, 2002**, Dr. Michael P. Finnegan, a nonexamining agency consultant, completed an RFC assessment (physical). Tr. 243-250.  Dr. Finnegan opined Fisk retained the RFC to perform sedentary work, and noted:

> 39 y.o. woman who has Hepatitis C with a viral load prior to therapy of 77,000.  She has been on combination of Interferon and Ribitol.  She has no evidence of liver compromise.  **Her major functional restrictions stem from the fatigue associated with therapy**.  She initially had nausea, diarrhea and fatigue **but now just has some fatigue**.  **This does not appear to be incapacitating.  She reports to her doctors that she is actually doing quite well**.  She now does not complain of nausea and diarrhea.  She is tired but able to live alone in an apartment and gets along well.  **Consideration is given to her fatigue and she is restricted as above.  When therapy is finished she should be capable of more.**

Tr. 241.  **On July 19, 2002,** Dr. Nickerson, a nonexamining agency consultant, reviewed the medical evidence and concurred with Dr. Finnegan's RFC assessment and his findings.

On **May 10, 2002**, Fisk returned to University Hospital Mental Health Center.  Tr. 286.
Fisk reported she was "still having a hard time" because of "family stressors and financial
concerns."  *Id.*  **Fisk complained of irritability, decreased sleep (about 4-6 hours per night),
and decreased energy**.  Dr. Arenella performed a Mental Status Examination, noting: **well
dressed, well groomed, cooperative; speech– slightly hoarse; mood/affect– tired/slightly
blunted; thought processes– linear; no suicidal ideation, no hallucinations, no delusions;
and judgment and insight– fair**.  Dr. Arenella opined Fisk was "**moderately ill**" on the Clinical
Global Impression Scale– Severity of Illness.  Dr. Arenella noted Fisk was "more depressed but
not suicidal."  *Id.*

On **May 31, 2002**, Fisk returned to the Gastroenterology Clinic for a follow-up with Dr.
Farrer.  Tr. 252-253.  Dr. Farrer noted Fisk had completed her six month treatment of pegylated
interferon and ribavirin.  **Fisk was still experiencing some weakness and some vomiting in the
morning**.  However, Fisk's appetite was good and her weight was stable.  **Fisk also reported
her depression over the last month had gotten worse and she was having trouble sleeping,
waking frequently throughout the night**.  Fisk's psychiatrist had suggested an antidepressant
which Fisk declined because her treatment was close to completion and she felt she would get
better.

Dr. Farrer performed a physical examination which was unremarkable.  Specifically, Dr.
Farrer noted, "she is alert and oriented in no apparent distress.  **She does not appear to be
depressed.  Her affect appears normal**."  Tr. 253.  Dr. Farrer also noted "**no jaundice, without
any signs of chronic liver disease, no hepatosplenomegaly**."  *Id.*  Dr. Farrer found Fisk's

"**quantitative hepatitis C was undetectable**" and "**her liver function tests were normal**." *Id.*

Dr. Farrer recommended Fisk return in four weeks to further assess her depression.

On **June 20, 2002**, Fisk returned for her follow-up visit with Dr. Arenella.  Tr. 285.  Fisk

reported she "**was doing well since stopping interferon**." *Id.*  Fisk also reported that "**she**

**initially became more irritable but was now more stable**." *Id.*  However, Fisk complained of

some irritability and racing thoughts.  Fisk also reported sleeping less but attributed this to having

to move since she had been approved for housing due to her disability.  Dr. Arenella performed a

Mental Status Examination, noting: **casually dressed, well groomed, cooperative; speech–**

**slightly hoarse**; **mood/affect– fine/euthymic; thought processes linear; no suicidal or**

**homicidal ideation, no hallucinations or delusions; judgment and insight–  fair.**  Dr.

Arenella assessed Fisk with Bipolar Affective Disorder II/ rule out Bipolar Affective Disorder

type I due to **increased energy**).  Dr. Arenella directed Fisk to continue taking the lithium and

begin trazadone 50 mg at bedtime as needed for insomnia.

On **July 11, 2002**, Fisk returned for her three month follow-up visit with Dr. Padilla.  Tr.

323-324.  Dr. Padilla noted Fisk was experiencing irregular menstrual cycles, otherwise she was

doing well.  Dr. Padilla directed Fisk to return for a follow-up visit in six months for a pap smear.

On **July 22, 2002**, Fisk returned to University Hospital Mental Health Center.  Tr. 284.

Fisk reported, "I'm all right." *Id.*  Fisk denied depression, denied suicidal or homicidal ideation,

and reported her appetite was improving.  Fisk requested help with her sleep because she was

sleeping only a maximum of five hours.  Drs. Armijo and Hensler evaluated Fisk.  Dr. Armijo

noted Fisk, was **"adequately groomed, her speech was normal, her mood was euthymic, her**

**mood was "all right," her thought processes were linear and goal-directed, her insight and**

**judgment were both adequate, and she denied suicidal and homicidal ideation and**

**hallucinations.**" *Id.* Dr. Armijo assessed Fisk as (1) "Bipolar Affective Disorder II, denies

symptoms of mania/depression; poor sleep but willing to increase trazadone (antidepressant)." *Id.*

Dr. Armijo directed Fisk to increase the trazadone to 100 mg at bedtime for her insomnia and

scheduled her for a follow-up visit in one week.  Dr. Armijo also referred Fisk to Dr. Hensley and

noted she would call the liver clinic to increase Fisk's lithobid to 1200 mg at bedtime.  Dr.

Hensler noted Fisk "**was doing fairly well on lithium**" and concurred with Dr. Armijo's plan of

action.

On **August 6, 2002**, Fisk went to University Hospital with concerns about menopause.

Tr. 297.  Fisk complained of hot flashes, mood swings, and irregular menses.  The attending

physician noted Fisk was alert and oriented.  Significantly, the physician noted, "**Bipolar– stable**

**per pt**." *Id.*  The attending physician referred Fisk to Dr. Lopez-Golberg for follow-up.

On **August 20, 2002**, Fisk went to University Hospital with complaints of back pain.  Tr.

296.  Fisk complained of right knee and leg pain for 1 ½ weeks.  Dr. Anderson treated Fisk's low

back pain with Toradol (nonsteroidal anti-inflammatory drug), Percocet (pain medication), and

Flexeril (muscle relaxant).

On **August 30, 2002**, Fisk returned for a follow-up of her low back pain.  Tr. 295.  Fisk

complained of "right gluteal pain radiating down the back of her leg to her toes." *Id.*  The

attending physician diagnosed her with sciatica and prescribed physical therapy, Flexeril, and

Percocet.  The attending physician directed Fisk to return if her symptoms worsened.

On **September 6, 2002**, Fisk returned to the Gastroenterology Clinic to check on her

repeat three months' viral load.  Tr. 338-339.  Dr. Arora noted Fisk had completed her hepatitis C

treatment on May 30, 2002.  At that time, Fisk had an **undetectable viral load**.  Fisk **"denied any abdominal pain, nausea, or vomiting.  She denied any history of melena, hematochezia, or hematemesis."** Tr. 338 (emphasis added).  Dr. Arora opined Fisk was "**doing well in general and had no major symptoms**." *Id.* (emphasis added).  Dr. Arora noted Fisk's August 13th **viral load was undetectable and her liver function test were normal**.  Dr. Arora performed a physical **examination which was unremarkable**.  Dr. Arora recommended a repeat viral load in six months "to confirm the cure of her hepatitis C." Tr. 339.  Significantly, Dr. Arora suggested Fisk have her repeat viral load done by her primary care physician and if it was negative, that would mean "she is cured of hepatitis C." *Id.*  Dr. Arora discharged Fisk form the Hepatitis C Clinic.

On **September 13, 2002**, Fisk returned for her follow-up with Dr. Lopez-Golberg.  Tr. 294.  Fisk reported her back pain had decreased.  Fisk was starting physical therapy on that day.  Dr. Lopez-Golberg prescribed Flexeril and physical therapy.   Dr. Lopez-Golberg noted Fisk needed a full physical.  Dr. Lopez-Golberg also referred Fisk for a nutritional assessment for weight loss.

On **October 22, 2002**, Fisk returned to University Hospital Behavioral Health Services.  Tr. 283.  **Fisk reported her depression was not too bad but complained of the "voices."**  Fisk reported she had heard voices "even as a child."  She identified the voice as "talking to myself in my head."  Dr. Armijo performed a Mental Status examination, noting: **casually dressed, increased rate of speech but normal tone and volume, mood is lonely, affect euthymic, cognition– alert and oriented, sleep is poor, appetite is "not too hot, energy varies, thought processes are linear; denies depersonalization, derealization, suicidal ideation, aggression,**

**delusions, phobias, "hears own voice," adequate judgment and insight**.  Under

social/occupational, Dr. Armijo noted **Fisk was taking nursing classes at TVI including math

and chemistry**.  Dr. Armijo **assessed Fisk as Bipolar Affective Disorder II with new

complaint of intrusive voice which is identified as her own**.  Dr. Hensler noted: "Pt seen w/

Dr. Armijo.  She's a 39 yo F w/BPAD II & Hep C.  **Pt. now reports hearing voices which she's

never reported but says she's hard this voice for years**.  She identifies it as her own voice,

which she hears . . . ." *Id.*  Dr. Armijo prescribed Seroquel (antipsychotic) 25 mg twice a day and

directed Fisk to return in two weeks to assess "voice/tolerance of Seroquel." *Id.*

On **October 25, 2002**, Fisk returned to see Dr. Lopez-Golberg.  Tr. 293.  Dr. Lopez-

Golberg performed a physical examination.  Fisk complained of back pain and right leg numbness

and tingling.  Fisk also reported suffering from "apnea during sleep– most of her life." *Id.*

**Otherwise, Fisk denied any other problems**.  Dr. Lopez-Golberg ordered lab work and directed

Fisk to continue taking Percocet at bedtime and return for a follow-up in 4-6 weeks.

On **November 14, 2002**, Fisk returned for her follow-up with Dr. Armijo.  Tr. 282.  Fisk

complained Seroquel disrupted her sleep.  Dr. Armijo noted, "Depression: good mood/+ interest,

denies suicidal or homicidal ideation, sporadic sleep, decreased appetite but no weight loss.

Mania: denies euphoria/denies irritability/flight of ideas: Soc/occup. – lives alone in apt.

altercations with neighbor who lives upstairs, will be moving to new rental house." *Id.*  Dr.

Armijo performed a Mental Status examination, finding: **"casually dressed; speech– normal

rate, tone, volume; mood– extremely good mood; affect– euthymic; cognition– alert and

oriented; sleep– 2-4 hours; appetite– decreased; energy– "I'm tired."– reports physical

illness/social stress; denies suicidal ideation or self destructive behavior; denies aggression;**

19

**denies delusions; denies OCD or phobias; hallucination– denies currently; judgment–
good; insight– good.**" *Id.* Fisk reported no improvement with the Seroquel and complained it
was unpleasant and wanted to discontinue taking it. Fisk stated the "voice" was situational due to
living situation which would improve once she moved to rental house. Dr. Hensler noted: "Pt
seen with Dr. Armijo. Patient reports she found Seroquel unpleasant and wishes to discontinue.
On further inquiry, **it is not clear that the "voice" she describes represents psychotic
phenomena**. Otherwise **she's doing well**. **Mood stable**. **Judgment good**." *Id.*

On **November 22, 2002**, Fisk returned for her follow-up with Dr. Lopez-Golberg. Tr.
292. Fisk reported her sciatica was "still present but improving." *Id.* Dr. Lopez-Golberg noted
Fisk needed lab work done in six months. Fisk was to return on an as needed basis.

On **January 23, 2003**, Fisk returned for her follow-up with Dr. Padilla. Tr. 313-315. Dr.
Padilla noted Fisk had not had a pap smear for one year. Tr. 313. Dr. Padilla also noted Fisk had
an undetectable viral load for hepatitis C. Tr. 314. **Fisk denied any problems, reported she
was going to school at TVI and studying to be a nurse**. Dr. Padilla performed a pap smear.

On **February 7, 2003**, Dr. Padilla performed a colposcopy and vaginoscopy. Tr. 313.
Fisk's pap smear had been abnormal (Tr. 309, 311)

On **February 20, 2003**, Fisk returned for her postoperative visit with Dr. Padilla. Tr.
316. Dr. Padilla noted Fisk was status post CO2 laser of VIN-I lesion. **Fisk was doing well**. Dr.
Padilla directed Fisk to return for a follow-up visit in three months.

On **February 26, 2003**, Fisk returned to the Behavioral Health Services. Tr. 242. The
therapist noted Fisk had been the interferon treatment for one year and **was doing very well**.
**Fisk was taking "nursing school pre-requisites.**" *Id.* The therapist performed a mental status

examination, noting: **well groomed, her mood was euthymic, her affect anxious, her cognition bright, her judgment and insight were good, her sleep, appetite, and energy were good, there was no "derailment" of her thought processes, there was no evidence of suicidal ideation or self destructive behavior, no aggression, no delusions, no phobias, and no hallucinations**.  The therapist opined Fisk's **bipolar disorder was "very stable."**  *Id.*  The therapist directed Fisk to return in 4-6 months for her follow-up but  have her lab work done in February.

On **March 6, 2003**, Fisk's treatment team completed a "Multidisciplinary Treatment Plan Review."  Tr. 341.  **The team noted Fisk was stable**.  The team recommended Fisk continue on Lithobid 600 mg twice a day, Klonopin .5 mg one to two at bedtime, and return for a follow-up in 4-6 months.

On **April 10, 2003**, Fisk's mental health provider at University Hospital, Behavioral Health Services noted **she was doing very well, she was well groomed, her mood was anxious, her speech fluent, her affect broad, her cognition average, and she was sleeping well**.  Tr. 343.  The therapist recommended Fisk start Zoloft 50 mg to 100 mg.

On **October 30, 2003**, Dr. Elizabeth Romero from University Hospital Psychiatric Center wrote a "To Whom It May Concern" letter, stating:

> Veronica Fisk is currently in treatment for Bipolar Affective Disorder at the UNM Psychiatric Center.  She attends regular appointments and takes medication for her illness.  Her psychiatric illness affects her ability to attend classes and memorize material.  Please make arrangements to accommodate for her condition.  Thank you for your cooperation.

Tr. 356.  Fisk submitted this letter to the Appeals Council and thus it was not before the ALJ.[2]

---

[2] Although the  evaluation was not before the ALJ, it was before the Appeals Council.  Tr. 6-7.  Therefore, the Court must consider it when evaluating the Commissioner's decision for substantial evidence.  *See, O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994)(new evidence

**B.  Step Four of the Sequential Evaluation Process**

At step four of the sequential evaluation process, a claimant bears the burden of proving that her medical impairments prevent her from performing work that she has performed in the past.  *See Williams v. Bowen*, 844 F.2d 748, 751 & n.2 (10th Cir. 1988).  In his decision, the ALJ found:

> The claimant's bipolar disorder is currently very stable on medications.  On April 10, 2003 her therapist reported that she was doing very well given her surgical problems.  On mental status examination the claimant was well groomed, with normal speech, euthymic mood and anxious affect.  Sleep, appetite, and energy were all good and there was no derailment in thought processes (Exhibit 19F).
>
> In addition to the lack of objective findings, the claimant has made several inconsistent statements when describing her limitations.  She testified that she has difficulty sleeping, [has] very low energy and continued liver pain.  However, at her recent doctor's visits she has told the doctor that she is feeling well, has no abdominal pain, and is sleeping well.  Mental status examination performed on March 3, 2003 revealed good sleep, appetite and energy (Exhibit F).
>
> Accordingly, I find the claimant retains the residual functional capacity to perform the full range of sedentary work.  She still experiences some fatigue which helped determine the sedentary residual functional capacity.
>
> This determination is consistent with the opinion of the State Agency medical consultant who completed a Residual Functional Capacity Assessment (Exhibit 9F).  As the opinion of a non-examining, non-treating physician, his opinion is not entitled to controlling weight, but must be considered and weighed as that of a highly qualified physician who is an expert in the evaluation of the medical issues in disability claims under the Social Security Act (SSR 96-6p).
>
> Based upon the claimant's residual functional capacity, I must determine whether the claimant can perform any of her past relevant work.  The phrase "past relevant work" is defined in the Regulations at 20 C.F.R. §§ 404.1565 and 416.965.  The work usually must have been performed within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and meet the definition of substantial gainful activity.

becomes part of the administrative record to be considered by the Court when evaluating the Commissioner's decision for substantial evidence).

> The evidence in this case establishes that the claimant has past relevant work as a bookkeeper. This was a sedentary job as performed by the claimant (Exhibit 4E).
>
> The claimant's past relevant work as a bookkeeper does not entail any functional demands beyond those outlined in my residual functional capacity finding above.  The claimant can perform her past relevant as a bookkeeper as she previously performed it and is therefore, not disabled as defined in the Social Security Act.

Tr. 17-18 (emphasis added).

Fisk contends that, at step four, "the ALJ erred in his assessment that [her] bipolar disorder and fatigue are not preventing her from performing her past relevant work."  Pl.'s Mem. Br. at 6.  Fisk argues the ALJ "cited to no other evidence to support his statement that her bipolar disorder was very stable."  *Id*.  Fisk also argues the ALJ "did not give any reasons why her fatigue would not preclude performing sedentary work . . . ."  *Id*. at 7.  According to Fisk, "[The ALJ] failed to explain how she could still perform sustained work, even though she had fatigue, which could have been caused from hepatitis C, the side effects of medications or symptoms of bipolar disorder."  *Id.*

A review of the record does not support Fisk's contentions.  The record as a whole provides substantial evidence to support the ALJ's finding that Fisk's Bipolar Affective Disorder Type II was stable on lithium.  *See* Tr. 181-182, 218, 242, 284, 288, 297, 341, 343.  Significantly, on **February 26, 2003**, Fisk's therapist opined her bipolar disorder was "very stable."  Tr. 242. Based on this assessment, the therapist directed Fisk to return for her follow-up in **4-6 months**.

And, although Fisk suffered from fatigue at the inception of her treatment with interferon, she later reported she was doing well.  In fact, on June 20, 2002, Dr. Arenella noted she had to rule out rule out Bipolar Affective Disorder type I (characterized by the occurrence of one or more manic episodes) because Fisk complained of **increased energy**.  *See* Tr. 285.  On that day,

Fisk also reported she "was doing well since stopping interferon" and "was now more stable." *Id.* On January 23, 2003, Fisk denied having any problems and reported she was attending TVI and was studying to be a nurse. Tr. 313-315. On February 20, 2003, Fisk reported she was doing well. Tr. 316. On February 26, 2003, Fisk's therapist noted Fisk had been on interferon treatment for one year and was doing very well. Tr. 242. The therapist also noted Fisk was taking nursing school pre-requisites. *Id.* Contrary to Fisk's assertion, the ALJ considered Fisk's fatigue in determining her RFC and found her fatigue did not preclude her from performing her past relevant work. Substantial evidence supports this finding.

Fisk cites to a 1988 Psychological Evaluation to support her disability. Fisk submitted this evaluation to the Appeals Council. However, the 1988 evaluation was done over sixteen years ago and is not from a treating source. The more recent psychiatric evaluations from her treating physicians are accorded more weight. *See, Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)(ALJ must "give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record."). The ALJ properly relied on Fisk's recent psychiatric evaluations to reach his conclusion regarding Fisk's mental impairment.

### C.  Failure to Develop the Record

Fisk contends "[t]he evidence indicating that Plaintiff had a mental problem triggered the ALJ's duty to develop the record in this regard." Pl.'s Mem. Br. at 9. Accordingly, Fisk claims the ALJ failed to fully develop the record when "[n]o other consultative evaluation of [her] mental impairments was performed." *Id.* at 10. Fisk also makes reference to a "possible brain injury from the motor vehicle accident" in her memorandum brief. Pl.'s Mem. Br. at 7. Fisk claims she

"had a MVA in February 1992, and passed out several times before a diagnosis of closed brain injury was made as reported 11-30-01 (TR 196)." Pl.'s Reply at 1.  Based on this statement, Fisk contends, "[t]his evidence warrants a neuropsychiatric evaluation."  *Id.*  However, page 196 of the transcript is a notation made on November 19, 2001 by Fisk's therapist on the Comprehensive Assessment Tool.  Tr. 196.  Under "History of Injuries," Mr. Chandler checked the box titled "Car Accidents" and noted the date, "Feb.11' 92."  There is no diagnosis or mention of a "closed brain injury" as represented by Fisk's counsel.

 The [Commissioner] has broad latitude in ordering consultative examinations.  *See Diaz v. Secretary of Health & Human Servs.,* 898 F.2d 774, 778 (10th Cir. 1990).  A consultative examination is often required for proper resolution of a disability claim when it is clear there is a direct conflict in the medical evidence requiring resolution, *see* 20 C.F.R. § 404.1519a(b)(4), or where the medical evidence in the record is inconclusive, *see Thompson*, 987 F.2d at 1491.  "Similarly, where additional tests are required to explain a diagnosis already contained in the record, resort to a consultative examination may be necessary."  *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997); *see also* 20 C.F.R. § 404.1517.

In this case, there was no conflict in the medical evidence, the medical evidence was not inconclusive and no additional tests were required to explain Fisk's mental impairment.  Fisk's treating psychiatrists and therapists provided substantial evidence to support the ALJ's finding that her Bipolar Affective Disorder II was stable on lithium and thus she retained the RFC for sedentary work.

As to Fisk's allegation of  a "possible" brain injury, the Court finds that there is no objective evidence in the record suggesting the existence of "a cold head injury" with resulting

impairments that could have a material impact on the disability decision requiring further

investigation.  As the *Hawkins* court explained:

> Ordinarily, the claimant must in some fashion raise the issue sought to be developed which, on its face, <u>must be substantial</u>.  Specifically, the claimant has the burden to make sure there is, in the record, <u>evidence sufficient to suggest a reasonable possibility that a severe impairment exists</u>.  When the claimant has satisfied his or her burden in that regard, it then, and only then, becomes the responsibility of the ALJ to order a consultative examination if such an examination is necessary or helpful to resolve the issue of impairment.
>
> Further, when the claimant is represented by counsel at the administrative hearing, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored.  Thus, in a counseled case, <u>the ALJ may ordinarily require counsel to identify the issue or issues requiring further development</u>.  <u>In the absence of such a request by counsel, we will not impose a duty on the ALJ to order a consultative examination unless the need for one is clearly established in the record</u>.
>
> The ALJ does not have to exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning.  <u>The standard is one of reasonable good judgment.  The duty to develop the record is limited to fully and fairly develop[ing] the record as to material issues</u>.

*Hawkins,* 113 F.3d at 1167 (internal citations and quotations omitted) (emphasis added).

A review of the record indicates there is no objective evidence to suggest the possibility of

a "closed head injury."   Moreover, Fisk's counsel never raised the issue at the administrative

hearing.  Accordingly, the Court finds that the ALJ was not required to order a neuropsychiatric

evaluation.

**D.  Conclusion**

The Court's role is to review the record to ensure that the ALJ's decision is supported by substantial evidence and that the law has been properly applied.  After such review, the Court is satisfied that substantial evidence supports the ALJ's determination that, despite her limitations, Fisk retained the RFC to perform sedentary work and thus she could return to her past relevant work.

A judgment in accordance with this Memorandum Opinion will be entered.

**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**